Exhibit 1

**18CI02870**

**COMMONWEALTH OF KENTUCKY**
**JEFFERSON CIRCUIT COURT**
**DIVISION ___**
**CIVIL ACTION NO. 18-CI-_____**

JEFFERSON CIRCUIT COURT
DIVISION TWELVE (12)

**CARDINAL SQUARE, LLC**
**PLAINTIFF**

v.

**ENVELOP GROUP, LLC;** 5/5
**VALIDATED CUSTOM SOLUTIONS, LLC;** 5/5
**OPEN CONTROL SYSTEMS, LLC;** 5/5
**LG ELECTRONICS U.S.A., INC.; and**
C/N



FILED IN CLERK'S OFFICE
DAVID L. NICHOLSON, CLERK
MAY 18 2018
BY_____
DEPUTY CLERK

**DEFENDANTS**

# JURY FEE PAID

## COMPLAINT

Plaintiff Cardinal Square, LLC (hereinafter "Plaintiff"), states as follows for its Complaint against Defendants Envelop Group, LLC (hereinafter "Envelop Group"), Validated Custom Solutions, LLC (hereinafter "VCS"), Open Control Systems (hereinafter "OCS"), and LG Electronics U.S.A., Inc. (hereinafter "LG"), (collectively "Defendants"):

### STATEMENT OF JURISDICTION

1. Plaintiff Cardinal Square, LLC is an Indiana limited liability company with its principal place of business located at 666 E Main St. C-1, Centerville, MI 49032.

2. Envelop Group is an Indiana limited liability company with its principal place of business located at 905 North Capitol Avenue, Indianapolis, IN, 46204. Upon information and belief Envelop Group LLC owns and controls defendants Validated Custom Solutions, LLC and Open Control Systems.

3. VCS is an Indiana limited liability company with its principal place of business located at 905 N. Capitol Ave., STE 200, Indianapolis, IN, 46204.

4. OCS is an Indiana limited liability company with its principal place of business located at 905 N. Capitol Ave., STE 200, Indianapolis, IN, 46204.

5. LG is a Delaware corporation with its principal place of business located in Englewood Cliffs, NJ.

6. Cardinal Square, LLC is the owner of two student housing apartment buildings called the Village Promenade (hereinafter "Village Promenade") located in at 1623 West University Avenue, Muncie, IN 47303 and serves primarily as housing for college students at Ball State University. In or around April 2013, Cardinal Square entered into a contract with VCS for the purchase of LG Variable Refrigerant Flow HVAC systems and related equipment (hereinafter the "HVAC Units") for use in the Village Promenade. The contract, amongst other requirements, required that the HVAC Units installed in the buildings function properly.

7. The HVAC Units did not meet the agreed specifications and since 2013, the HVAC Units have experienced premature failures, including but not limited to failures of thermistors, sensors, and boards as well as continued leaking of coolant and excess condensation from the defective installation, commissioning and maintenance of the units. Despite Cardinal Square's best efforts to inform Defendants of these issues and provide them opportunities to correct their failures, the HVAC Units have not worked properly and have caused significant damages to Cardinal Square.

8. This Court has subject matter jurisdiction over this action as Cardinal Square's damages exceed the required jurisdictional minimum.

9. Jurisdiction and venue are proper as Validated Custom Solutions and Cardinal Square expressly agreed in the contract subject to this lawsuit that all disputes arising out of the contract shall be submitted to a court of competent jurisdiction in Jefferson County, Kentucky.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

10. On November 18, 2013, Cardinal Square, LLC, by and through its manager, Larry Gough, executed a general construction contract with Whittenberg Construction Company. The work to be performed under the contract was the construction of two student housing apartment buildings in Muncie, Indiana (the Village Promenade) owned by Plaintiff.

11. In September 2013, Plaintiff engaged VCS in conversations to discuss the installation, commissioning and maintenance of HVAC units for the Village Promenade.

12. Validated Custom Solutions ("VCS") has knowledge, experience and expertise in installing, commissioning, and maintenance of HVAC units and the use of same to third parties.

13. Cardinal Square has experience in development of residential student housing, but has no expertise in installation, commissioning and maintenance of HVAC units.

14. Based on VCS's knowledge, experience and expertise in installing, commissioning and maintaining HVAC systems, Cardinal Square chose to contract with VCS for that purpose.

15. On November 6, 2013, Cardinal Square, LLC, by and through its manager, Larry Gough, executed a Purchase Order with VCS (the "Purchase Order"), by and through VCS owner Dan Fillenwarth, for the purchase, installation, commissioning and maintenance of the HVAC Units for the Village Promenade (attached as *Exhibit A*).

16. The Purchase Order provided, among other things, that Cardinal Square, LLC was to pay a total of $1,281,860.00 to VCS for purchase, installation and maintenance of the HVAC Units for the two buildings at the Village Promenade.

17. The Purchase Order described the items to be delivered as follows:

> All LG VRV HVAC equipment for Buildings #1 & #2. All equipment is to be an equal to the specified Daikin units and as approved by the mechanical engineer. Supplier is responsible to provide piping layouts to the HVAC subcontractors.

18. The Purchase Order provided that VSC was responsible for the installation, commissioning, checking, testing, startup and maintenance of the HVAC Units at the Village Promenade.

19. The Village Promenade is composed of two buildings ("Village Promenade Bldg. 1" and Village Promenade Bldg. 2").

20. VCS, and its agents, was responsible for the installation, startup and commissioning of the HVAC Units at Village Promenade.

21. The LG equipment purchased and commissioned at the Village Promenade pursuant to the Purchase Order included 20 condensing units and 218 fan coil units in Village Promenade Bldg. 1 and 16 condensing units and 166 fan coil units in Village Promenade Bldg. 2.

22. The city of Muncie, IN issued a certificate of occupancy on August 14, 2014 for the Village Promenade.

**THE HVAC UNITS AT CARDINAL SQUARE FAIL TO WORK PROPERLY**

23. VCS or its agents started to bring the HVAC Unit systems on line as the Village Promenade buildings were completed.

24. During much of the period that VCS provided servicing, maintaining, supporting and repairing the HVAC Units, the HVAC Units failed to work properly, including but not limited to failures of thermistors, sensors, and boards as well as continued leaking of coolant and excess condensation from the defective installation, commissioning and maintenance of the HVAC Units.

25. Upon information and belief, and only recently discovered by Plaintiff, the HVAC Units were not installed to manufacturer and engineering specifications.

26. Upon information and belief, and only recently discovered by Plaintiff, the HVAC Units were not serviced to manufacturer and engineering specifications.

4

27. VCS continually represented to Cardinal Square that the HVAC Units installed at Village Promenade were equivalent to specified Daikin units as required by the Purchase Order.

28. The HVAC Units installed at Village Promenade were not equivalent to the specified Daikin units as required by the Purchase Order.

29. The HVAC Units do not perform their essential function of heating and/or cooling rendering them useless or of significantly diminished value long before the end of their reasonably expected useful life. The defects also present risks to the safety of consumers due to the inability to control the temperature in the rooms and/or buildings where they were installed. The defects have also damaged the Plaintiffs' buildings. The defects, including refrigerant leaks, among others, present numerous known and unknown hazards.

30. After the HVAC Units were installed by and being maintained and serviced by VCS, VCS continued to represent to Cardinal Square that the malfunctions occurring to the HVAC Units were part of normal wear and tear and that the HVAC Units were equal to specified Daikin units as required by the Purchase Order.

31. According to the Purchase Order, VCS provided a warranty for the HVAC Units "against all deficiencies and defects in materials and/or workmanship."

32. The warranties provided by VCS in the Purchase Order were "for a period of one (1) year from the date(s) of substantial completion" and provides that "[r]epair or replacement of materials after substantial completion/acceptance renews and restarts the warranty period for those repaired/replaced items."

33. At various points in time between the initial installation of the HVAC Units until recently, VCS, by and through various agents, provided service to the HVAC Units at Village Promenade as required by the warranties.

5

34. VCS's words, actions, misstatements and omissions relating to this dispute constitute breach of contract and negligence, among other causes of action known, and to be discovered.

## COUNT 1: BREACH OF CONTRACT

35. Plaintiff incorporates by reference the allegations in paragraphs 1 through 34 as if fully set forth herein.

36. Plaintiff entered into a Purchase Order with VCS for the purchase, installation and servicing of the HVAC Units.

37. The Purchase Order contained express warranties whereby VCS was to provide certain warranties for its materials against all deficiencies and defects.

38. The HVAC Units have not functioned properly, have failed prematurely and have caused damage to Plaintiff's equipment and buildings.

39. In connection with VCS's acts and/or omissions relating to this action, including, but not limited to, the actionable conduct set forth above, VCS is in breach of the Purchase Order, which includes, but is not limited to, breach of express warranties.

40. Plaintiff has performed all contractual conditions required of it.

41. Plaintiff has suffered and will continue to suffer damages as a result of the acts describe above, and is therefore entitled to compensatory, consequential, and incidental damages from VCS, as well as attorneys' fees, costs, expenses, and all other relief as may be appropriate.

## COUNT 2: BREACH OF IMPLIED WARRANTIES

42. Plaintiff incorporates by reference the allegations in paragraphs 1 through 41 as if fully set forth herein.

43. At all relevant times, LG was and is in the business of selling, commissioning and servicing HVAC units.

44. At all times relevant herein, LG impliedly warranted in a uniform manner to Plaintiff that the HVAC Units were of the same or greater quality as generally accepted for HVAC Units and were safe and fit for their intended use as air conditioners.

45. Contrary to LG's implied warranties, the HVAC Units were not of merchantable quality at the time of sale, as they were not fit for the ordinary purposes for which such goods are used and/or do not conform to the promises or affirmations of fact made to Plaintiff. The HVAC Units contained inherent, latent defects at the time of sale that were substantially certain to result in malfunction during the useful life of the product such that the HVAC Units would not perform their essential functions.

### COUNT 3: NEGLIGENCE

46. Cardinal Square incorporates by reference the allegations in paragraphs 1 through 45 as if fully set forth herein.

47. At all relevant times, VCS owed a duty to exercise reasonable care towards Plaintiff.

48. At all relevant times, VCS owed a duty to exercise reasonable care in the installation, startup, commissioning, inspection, servicing and maintenance of the HVAC Units.

49. In connection with the installation, commissioning and servicing of the HVAC Units, VCS had a duty to comply with all applicable standards of care, statutes, rules, regulations, specifications and policies in their design, installation, inspection, and maintenance of the HVAC Units.

50. VCS breached its duties by failing to properly install, startup, commission, and service the HVAC Units for Plaintiff.

51. As a direct, proximate and foreseeable result of VCS's misconduct, Plaintiff suffered harm, including but not limited to: loss of rent, damage to property other than the HVAC Units, damage to Cardinal Square's reputation and cost to repair the HVAC Units and other attendant structures.

## COUNT 4: PRODUCTS LIABILITY: STRICT LIABILITY

52. Plaintiff incorporates by reference the allegations in paragraphs 1 through 51 as if fully set forth herein.

53. LG is the designer, manufacturer and seller of the HVAC Units at Village Promenade.

54. LG was in the business of designing, manufacturing and selling HVAC units at the time the HVAC Units were installed at Village Promenade.

55. LG placed the HVAC Units into the stream of commerce.

56. The HVAC Units were defective and unreasonably dangerous at the time they were placed into the stream of commerce by LG.

57. Plaintiff is in the class of persons which LG should reasonably have foreseen would suffer damages from the defective nature of the HVAC Units.

58. The HVAC Units reached Plaintiff's location without substantial alteration.

59. The HVAC Units were unreasonably dangerous to Plaintiff's property.

60. LG failed to properly package or label the HVAC Units with reasonable warnings about its dangers and failed to give reasonable complete instructions about the proper use of the product.

61. Plaintiff has suffered damage due to the defective nature of the HVAC Units.

## COUNT 5: PRODUCTS LIABILITY: NEGLIGENCE

62. Plaintiff incorporates by reference the allegations in paragraphs 1 through 61 as if fully set forth herein.

63. LG failed to use reasonable care in designing the HVAC Units at issue, in manufacturing the HVAC Units at issue, in marketing and selling the HVAC Units at issue, in failing to warn Plaintiff about the danger of the HVAC Units when LG knew, or should have known, or should have discovered the danger and selling and putting the HVAC Units into the stream of commerce when they were in a defective condition unreasonable dangerous to users and/or consumers.

64. LG was negligent in its failure to use reasonable care by doing something a reasonably careful person would not do in a similar situation, and/or failing to do something a reasonably careful person would do in a similar situation.

65. As a direct and proximate result of the carelessness and negligence of LG in failing to design, manufacture, market, install and maintain the HVAC Units in a reasonably safe condition, Plaintiff suffered damages.

**WHEREFORE**, Cardinal Square, LLC demands as follows:

1.       All recoverable compensatory, actual, incidental, consequential, and all other damages prayed for herein, in an amount to be proven at trial and in excess of the jurisdictional minimum of this Court;

2.       Payment of reasonable attorneys' fees and costs as may be allowable under applicable law;

3.       Trial by jury on all issues so triable;

4.       For leave to file amended pleadings, as justice requires; and

5. All other appropriate relief in law or in equity to which it may now or hereafter be entitled.

Respectfully submitted,

GADDIS & MATTHEWS PLLC

Jonathan H. Matthews
1800 Stevens Ave.
Louisville, Kentucky 40205
Phone: (502) 805-2303
jon@gaddismatthews.com
*Counsel for Plaintiff Cardinal Square, LLC*

CARDINAL SQUARE, LLC                                        **PLAINTIFF**

v.

ENVELOP GROUP, LLC; ~~S/S~~
VALIDATED CUSTOM SOLUTIONS, LLC;
OPEN CONTROL SYSTEMS, LLC; ~~S/S~~
LG ELECTRONICS U.S.A., INC.

*FILED IN CLERK'S OFFICE
DAVID L. NICHOLSON, CLERK
MAY 25 2018
BY
DEPUTY CLERK*

                                                          **DEFENDANTS**

<u>**AMENDED COMPLAINT**</u>

Plaintiff Cardinal Square, LLC (hereinafter "Plaintiff" or "Cardinal Square"), states as

follows for its Complaint against Defendants Envelop Group, LLC (hereinafter "Envelop Group"),

Validated Custom Solutions, LLC (hereinafter "VCS"), Open Control Systems (hereinafter

"OCS"), and LG Electronics U.S.A., Inc. (hereinafter "LG"), (collectively "Defendants"):

<u>**STATEMENT OF JURISDICTION**</u>

1.  Plaintiff Cardinal Square, LLC is an Indiana limited liability company with its principal

place of business located at 666 E Main St. C-1, Centerville, MI 49032.

2.  Envelop Group is an Indiana limited liability company with its principal place of business

located at 905 North Capitol Avenue, Indianapolis, IN, 46204.  Upon information and belief

Envelop Group LLC owns and controls defendants Validated Custom Solutions, LLC and Open

Control Systems, LLC.

3.  VCS is an Indiana limited liability company with its principal place of business located at

905 N. Capitol Ave., STE 200, Indianapolis, IN, 46204.

4. OCS is an Indiana limited liability company with its principal place of business located at 905 N. Capitol Ave., STE 200, Indianapolis, IN, 46204. Upon information and belief OCS is owned and controlled by defendant Envelop Group, LLC. Upon information and belief OCS is, an agent, and acted as an agent of VCS at all relevant times herein.

5. LG is a Delaware corporation with its principal place of business located in Englewood Cliffs, NJ.

6. Plaintiff is the owner of two student housing apartment buildings called the Village Promenade (hereinafter "Village Promenade") located in at 1623 West University Avenue, Muncie, IN 47303 and serves primarily as housing for college students at Ball State University. In or around April 2013, Plaintiff entered into a contract with VCS for the purchase of LG Variable Refrigerant Flow HVAC systems and related equipment (hereinafter the "HVAC Units") for use in the Village Promenade. The contract, amongst other requirements, required that the HVAC Units installed in the buildings function properly.

7. The HVAC Units did not meet the agreed specifications and since 2014, the HVAC Units have experienced premature failures, including but not limited to failures of thermistors, sensors, and boards as well as continued leaking of coolant and excess condensation from the defective commissioning, checking, testing and maintenance of the units. Despite Plaintiff's best efforts to inform Defendants of these issues and provide them opportunities to correct their failures, the HVAC Units have not worked properly and have caused significant damages to Plaintiff.

8. This Court has subject matter jurisdiction over this action as Plaintiff's damages exceed the required jurisdictional minimum.

9. Jurisdiction and venue are proper as VCS and Plaintiff expressly agreed in the contract subject to this lawsuit that all disputes arising out of the contract shall be submitted to a court of competent jurisdiction in Jefferson County, Kentucky.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

10. On November 18, 2013, Plaintiff, by and through its manager, Larry Gough, executed a general construction contract with Whittenberg Construction Company. The work to be performed under the contract was the construction of two student housing apartment buildings in Muncie, Indiana (the Village Promenade) owned by Plaintiff.

11. In September 2013, Plaintiff engaged VCS in conversations to discuss the installation, commissioning and maintenance of HVAC units for the Village Promenade.

12. In or around September 2013, VCS, by and through its agent Dan Fillenwarth, represented to Plaintiff as inducement to enter into a contract that the HVAC Units would be equivalent to, and perform better than, specified Daiken brand HVAC units which Plaintiff owned and used in other residential properties owned by Plaintiff.

13. LG, by and through its agent Dan Hansen, also made representations to Plaintiff that the HVAC Units would be equivalent to, and perform better than, specified Daiken brand HVAC units which Plaintiff owned and used in other residential properties owned by Plaintiff.

14. VCS had knowledge of the specified Daiken brand HVAC units owned by Plaintiff and of their performance.

15. In fact, VCS knew that the HVAC Units were not equivalent to the Daiken brand HVAC units owned and utilized by Plaintiff in Plaintiff's other residential properties.

16. VCS also represented to Plaintiff that the HVAC Units would perform better and require less maintenance costs than specified Daiken brand HVAC units which Plaintiff owned and used in other residential properties owned by Plaintiff.

17. VCS has knowledge, experience and expertise in installing, commissioning, and maintenance of HVAC units and the use of same to third parties.

18. Cardinal Square has experience in development of residential student housing, but has no expertise in installation, commissioning and maintenance of HVAC units.

19. Based on VCS's knowledge, experience and expertise in installing, commissioning and maintaining HVAC systems, Plaintiff chose to contract with VCS for that purpose.

20. On November 6, 2013, based on the representations made by VCS, Cardinal Square, LLC, by and through its manager, Larry Gough, executed a Purchase Order with VCS (the "Purchase Order") by and through VCS owner Dan Fillenwarth, for the purchase, commissioning, checking, testing, start-up and maintenance of the HVAC Units for the Village Promenade (attached as *Exhibit A*).

21. The Purchase Order provided, among other things, that Cardinal Square, LLC was to pay a total of $1,281,860.00 to VCS for purchase, commissioning, checking, testing, start-up and maintenance of the HVAC Units for the two buildings at the Village Promenade.

22. The Purchase Order described the items to be delivered as follows:

All LG VRV HVAC equipment for Buildings #1 & #2. All equipment is to be an equal to the specified Daikin units and as approved by the mechanical engineer. Supplier is responsible to provide piping layouts to the HVAC subcontractors.

23. The Purchase Order provided, among other things, that VSC was responsible for the, commissioning, checking, testing, start-up and maintenance of the HVAC Units at the Village Promenade.

24. The Village Promenade is composed of two buildings ("Village Promenade Bldg. 1" and Village Promenade Bldg. 2").

25. VCS, and its agents, were responsible for the testing, startup and commissioning of the HVAC Units at Village Promenade.

26. The LG equipment purchased and commissioned at the Village Promenade pursuant to the Purchase Order included 20 condensing units and 218 fan coil units in Village Promenade Bldg. 1 and 16 condensing units and 166 fan coil units in Village Promenade Bldg. 2.

27. The city of Muncie, IN issued a certificate of occupancy on August 14, 2014 for the Village Promenade.

**THE HVAC UNITS AT CARDINAL SQUARE FAIL TO WORK PROPERLY**

28. VCS or its agents started to bring the HVAC Unit systems on line as the Village Promenade buildings were completed.

29. During much of the period that VCS (and its agents, including but not limited to OCS), provided servicing, maintaining, supporting and repairing the HVAC Units, the HVAC Units failed to work properly, including but not limited to failures of thermistors, sensors, and boards as well as continued leaking of coolant and excess condensation from the defective start-up, commissioning and maintenance of the HVAC Units.

30. Upon information and belief, and only recently discovered by Plaintiff, the HVAC Units were not commissioned by VCS to generally accepted industry standards and best practices for HVAC commissioning.

31. Upon information and belief, and only recently discovered by Plaintiff, the HVAC Units were not serviced by VCS or its agents, including but not limited to OCS, to manufacturer and engineering specifications.

5

32. VCS continually represented to Cardinal Square that the HVAC Units installed at Village Promenade were equivalent to specified Daikin units as required by the Purchase Order.

33. Pursuant to the Purchase Order, VCS was responsible for commissioning and testing the HVAC Units to ensure proper functioning.

34. Pursuant to the Purchase Order, VCS was responsible for approving that the installation of the HVAC Units was done properly and that the HVAC Units were ready for start-up.

35. It was VCS's responsibility in commissioning the HVAC Units to approve there were no installation deficiencies, or other deficiencies, with respect to the HVAC Units.

36. By commissioning, checking and approving start-up of the HVAC Units installed at Village Promenade, VCS represented to Plaintiff that the HVAC Units were installed properly, were working properly and were fit for their intended use.

37. During the installation of the HVAC Units, VCS periodically came to the Village Promenade to inspect the installation and never notified Plaintiff of any installation deficiencies.

38. VCS commissioned and tested the HVAC Units prior to initial start-up and never notified Plaintiff of any deficiencies with any of the subcontractors performing the installation.

39. The HVAC Units installed at Village Promenade were not equivalent to the specified Daikin units as required by the Purchase Order.

40. The HVAC Units do not perform their essential function of heating and/or cooling rendering them useless or of significantly diminished value long before the end of their reasonably expected useful life. The defects also present risks to the safety of consumers due to the inability to control the temperature in the rooms and/or buildings where they were installed. The defects have also damaged the Plaintiffs' buildings. The defects, including refrigerant leaks, among others, present numerous known and unknown hazards.

41. After the HVAC Units were commissioned and being maintained and serviced by VCS, VCS continued to represent to Cardinal Square that the malfunctions occurring to the HVAC Units were part of normal wear and tear and that the HVAC Units were equal to specified Daikin units as required by the Purchase Order.

42. According to the Purchase Order, VCS provided a warranty for the HVAC Units "against all deficiencies and defects in materials and/or workmanship."

43. The warranties provided by VCS in the Purchase Order were "for a period of one (1) year from the date(s) of substantial completion" and further provides that "[r]epair or replacement of materials after substantial completion/acceptance renews and restarts the warranty period for those repaired/replaced items."

44. The Purchase Order did not contain any waiver of implied warranties.

45. At various points in time between the initial installation of the HVAC Units until recently, VCS, by and through various agents, provided service to the HVAC Units at Village Promenade as required by the warranties.

46. On several occasions, including on or about August 17, 2017, VCS performed a full recommissioning and attempted repair of the HVAC Units.

47. After the HVAC Units started to malfunction, VCS, by and through its agent Dan Fillenwarth, continually represented to Plaintiff that VCS would honor and extend the warranties provided to Plaintiff presumably for the purpose of delaying any legal action by Plaintiff against VCS. In fact, VCS did not honor or extend warranties in conformance with its representations.

48. VCS's words, actions, misstatements and omissions relating to this dispute constitute breach of contract, breach of warranties, misrepresentation, fraud, and negligence, among other causes of action known, and to be discovered.

## COUNT 1: BREACH OF CONTRACT

49. Plaintiff incorporates by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

50. Plaintiff contracted with VCS for the purchase, start-up, checking, commissioning, maintenance and servicing of the HVAC Units.

51. The Purchase Order contained, among other things, express warranties whereby VCS was to provide certain warranties for its materials against all deficiencies and defects.

52. The HVAC Units were not equivalent to the specified Daiken brand HVAC units as required in the Purchase Order.

53. The HVAC Units have not functioned properly, have failed prematurely and have caused damages to the Plaintiff.

54. In connection with VCS's acts and/or omissions relating to this action, including, but not limited to, the actionable conduct set forth above, VCS is in breach of the Purchase Order, which includes, but is not limited to, breach of express and implied warranties.

55. Plaintiff has performed all contractual conditions required of it.

56. Plaintiff has suffered and will continue to suffer damages as a result of the acts described above, and is therefore entitled to compensatory, consequential, and incidental damages from VCS, as well as attorneys' fees, costs, expenses, and all other relief as may be appropriate.

## COUNT 2: BREACH OF IMPLIED WARRANTIES

57. Plaintiff incorporates by reference the allegations in paragraphs 1 through 56 as if fully set forth herein.

58. At all relevant times, LG was and is in the business of selling, commissioning and servicing HVAC units.

59. Plaintiff bought the HVAC Units which were manufactured, marketed to them, warranted, and intended to be purchased by buyers such as Plaintiff, by LG, and are in privity with LG through its purchase of the HVAC Units.

60. Plaintiff had sufficient direct dealings with LG or its agents to establish privity of contract between Plaintiff and LG.

61. Further, Plaintiff is an intended third-party beneficiary of contracts between LG and VCS; specifically, Plaintiff is the intended beneficiary of LG's express and implied warranties. VCS was not intended to be the ultimate buyers of the HVAC Units; the warranties were designed for and intended to benefit the ultimate buyers such as Plaintiff only. Moreover, privity is not required where a manufacturer makes representations directly to the intended buyer, as LG did here.

62. At all times relevant herein, LG impliedly warranted in a uniform manner to Plaintiff that the HVAC Units were of the same or greater quality as generally accepted for HVAC Units and were safe and fit for their intended use as air conditioners.

63. Contrary to LG's implied warranties, the HVAC Units were not of merchantable quality at the time of sale, as they were not fit for the ordinary purposes for which such units are used and/or do not conform to the promises or affirmations of fact made to Plaintiff. The HVAC Units contained inherent, latent defects at the time of sale that were substantially certain to result in malfunction during the useful life of the product such that the HVAC Units would not perform their essential functions.

## COUNT 3: MISREPRESENTATION

64. Plaintiff incorporates by reference the allegations in paragraphs 1 through 63 as if fully set forth herein.

65. By the words and actions set forth herein, VCS made material representations to Plaintiff which were false and/or intentionally misleading.

66. VSC made these false, material representations to Plaintiff knowing them to be false, or made such false, material representations recklessly.

67. VSC made these false, material representations to induce Plaintiff to act, or refrain from acting, including but not limited to entering into contracts, agreeing to purchase additional services and products to service the HVAC Units and agreeing not to terminate the business relationship when the HVAC Units were failing.

68. Plaintiff relied on these false, material representations when acting, or refraining from acting, as the case may be.

69. Plaintiff has suffered and will continue to suffer damages as a result of the acts describe above, and is therefore entitled to compensatory, consequential, and punitive damages from VCS, as well as attorneys' fees, costs, expenses, and all other relief as may be appropriate.

## COUNT 4: FRAUDULENT CONCEALMENT

70. Plaintiff incorporates by reference the allegations in paragraphs 1 through 69 as if fully set forth herein.

71. In connection with the acts, omissions and transactions set forth above, VCS intentionally and/or recklessly concealed material information from Plaintiff.

72. VCS intentionally and/or recklessly concealed material information from Plaintiff intending that Plaintiff act, or refrain from acting, in ignorance of the material information that VCS was concealing.

73. Plaintiff has suffered and will continue to suffer damages as a result of the acts described above, and is therefore entitled to compensatory, consequential, and punitive damages from VCS, as well as attorneys' fees, costs, expenses, and all other relief as may be appropriate.

## COUNT 5: FRAUDULENT INDUCEMENT

74. Plaintiff incorporates by reference the allegations in paragraphs 1 through 73 as if fully set forth herein.

75. VCS made false, material misrepresentations to Plaintiff knowing them to be false, or made them recklessly without regard to the truth or falsity of the misrepresentations. VCS also failed to disclose material information to Plaintiff.

76. VCS made false, material misrepresentations and omissions intending that they be acted upon by Plaintiff, and to secure Plaintiff's agreement to contracts and services to be provided to Plaintiff.

77. Plaintiff acted upon, or refrained from acting upon, VCS's false, material misrepresentations and omissions to Plaintiff's detriment.

78. Plaintiff has suffered and will continue to suffer damages as a result of the acts describe above, and is therefore entitled to compensatory, consequential, and punitive damages from VCS, as well as attorneys' fees, costs, expenses, and all other relief as may be appropriate.

## COUNT 6: NEGLIGENCE

79. Plaintiff incorporates by reference the allegations in paragraphs 1 through 78 as if fully set forth herein.

80. At all relevant times, VCS owed a duty to exercise reasonable care towards Plaintiff.

81. At all relevant times, VCS owed a duty to exercise reasonable care in the startup, checking, commissioning, inspection, servicing and maintenance of the HVAC Units.

82. In connection with the start-up, checking, commissioning and servicing of the HVAC Units, VCS had a duty to comply with all applicable standards of care, statutes, rules, regulations, specifications and policies in their design, installation, inspection, and maintenance of the HVAC Units.

83. VCS breached its duties by failing to properly check, startup, commission, and service the HVAC Units for Plaintiff.

84. As a direct, proximate and foreseeable result of VCS's misconduct, Plaintiff suffered harm, including but not limited to: loss of rent, damage to property other than the HVAC Units, damage to Cardinal Square's reputation and cost to repair the HVAC Units and other attendant structures.

## COUNT 7: PRODUCTS LIABILITY: STRICT LIABILITY

85. Plaintiff incorporates by reference the allegations in paragraphs 1 through 84 as if fully set forth herein.

86. LG is the designer, manufacturer and seller of the HVAC Units at Village Promenade.

87. LG was in the business of designing, manufacturing and selling HVAC units at the time the HVAC Units were installed at Village Promenade.

88. LG placed the HVAC Units into the stream of commerce.

89. The HVAC Units were defective and unreasonably dangerous at the time they were placed into the stream of commerce by LG.

90. Plaintiff is in the class of persons which LG should reasonably have foreseen would suffer damages from the defective nature of the HVAC Units.

91. The HVAC Units reached Plaintiff's location without substantial alteration.

92. The HVAC Units were unreasonably dangerous to Plaintiff's property.

93. LG failed to properly package or label the HVAC Units with reasonable warnings about its dangers and failed to give reasonable complete instructions about the proper use of the product.

94. Plaintiff has suffered damage due to the defective nature of the HVAC Units.

### COUNT 8: PRODUCTS LIABILITY: NEGLIGENCE

95. Plaintiff incorporates by reference the allegations in paragraphs 1 through 94 as if fully set forth herein.

96. LG failed to use reasonable care in designing the HVAC Units at issue, in manufacturing the HVAC Units at issue, in marketing and selling the HVAC Units at issue, in failing to warn Plaintiff about the danger of the HVAC Units when LG knew, or should have known, or should have discovered the danger and selling and putting the HVAC Units into the stream of commerce when they were in a defective condition unreasonable dangerous to users and/or consumers.

97. LG was negligent in its failure to use reasonable care by doing something a reasonably careful person would not do in a similar situation, and/or failing to do something a reasonably careful person would do in a similar situation.

98. As a direct and proximate result of the carelessness and negligence of LG in failing to design, manufacture, market, install and maintain the HVAC Units in a reasonably safe condition, Plaintiff suffered damages.

**WHEREFORE,** Cardinal Square, LLC demands as follows:

1.      All recoverable compensatory, actual, incidental, consequential, and all other damages prayed for herein, in an amount to be proven at trial and in excess of the jurisdictional minimum of this Court;

2.  Payment of reasonable attorneys' fees and costs as may be allowable under applicable law;

3.  Trial by jury on all issues so triable;

4.  For leave to file amended pleadings, as justice requires; and

5.  All other appropriate relief in law or in equity to which it may now or hereafter be entitled.

Respectfully submitted,

GADDIS & MATTHEWS PLLC

Jonathan H. Matthews
1800 Stevens Ave.
Louisville, Kentucky 40205
Phone: (502) 805-2303
jon@gaddismatthews.com
*Counsel for Plaintiff Cardinal Square, LLC*

# EXHIBIT A

# Cardinal Square, LLC.

666 E. Main St, Suite C-1
Centreville, MI 49032

## Purchase Order- Ball State Student Housing- Village Renovation

Date: 25-Oct-13
P.O.#: #0454-OWNERPO001
Cost Code: HVAC Equipment

alldated Custom Solutions
128 North College Ave.
dianapolis, IN 46220
ttn: Dan Fillenwarth

Ship to:
Ball State Student Housing- Village Renovation
c/o Whittenberg Construction Company
324 N. Martin Street
Muncie, IN 47303
Attn: Bobby Smith

ease enter the following order in accordance with the specifications, plans (see attached list), addenda (1-4 & MEP PB Addendum #1)
id the terms and conditions listed herein.

| Qty | UOM | Description | Unit Price | Total |
|-----|-----|-------------|------------|-------|
| 1 | Lump Sum | All LG VRV HVAC equipment for Buildings #1 & #2. All equipment is to be an equal to the specified Daikin units and as approved by the mechanical engineer. Supplier is responsible to provide piping layouts to the HVAC subcontractors. | $1,198,000.00 | $1,198,000.00 |
| 1 | Lump Sum | Indiana State Sales tax | $83,860.00 | $83,860.00 |
| | | | PO Total: | $1,281,860.00 |

IPORTANT: All shipping notices, freight bills and invoices shall include the Purchase Order No. and the Name of the Project.
I bills should be mailed to: Whittenberg Construction Company; 4774 Allmond Avenue; Louisville, KY 40209; Attn: Accounts Payable.
I deliveries must be verified with Bobby Smith, the project superintendent at 502-664-7711, 24 hours prior to delivery.
intative Ship Date: As needed          VIA: The Best Way          F.O.B.: Jobsite

ERMS:

Net 30 days.
This P.O. includes Indiana sales tax.
No fuel surcharge is allowed.
Price is good for the duration of the project.
Purchase order is contingent upon approved submittals.
Includes all commissioning, check, test, & start-up, 1st year labor warranty, 2 year manufacturers parts only warranty for all units and 6 year compressor parts only warranty for LG
tV HVAC equipment as required.
LG Equipment representative to perform inspections as neccesary in order to maintain project schedule.
Equipment is to be shipped as required (Coordination with HVAC subcontractors is included).
Includes energy montioring system: A total of 7 (4 in building #1, 3 in building #2) AC Smart Touchscreen central controllers with expansion card for all units The AC smart system
capable of monitoring all the LG systems and notifying the owner, VCS, or an independent service contractor if any alarms are activated. Malfunction reporting- The service shall
ovide immediate notification of a system malfunction via e-mail to the owner, installing contractor, and local LG service company. This service shall be provided to the customer
o of charge for a period of 12 months from day of start-up of the system

PARTIES: Whittenberg Construction Company is hereafter referred to as the "WCC" and the company above will hereafter be referred to as the "Vendor".The owner of the project
I be referred to hereafter as "Owner" This Purchase Order hereafter referred to as "Order" may be used to purchase services, supplies, machinery, equipment and other goods
SCOPE OF WORK: The Vendor shall deliver this Order in strict conformance with the Plans, Specifications, Addenda 1 thru 4, and the Terms of this Order, all of which have
en examined by the Vendor prior to the execution of this Order. The material(s) shall be delivered at the direction of WCC based upon a mutually agreeable delivery
iedule
PRICE: As full compensation for delivery of the Order, WCC agrees to pay the Vendor in current funds the price set forth above for the satisfactory fulfillment of this Order.
e Vendor agrees that he will furnish a waiver of lien, waiver of rights to claim against Payment Bond for this project as WCC may require from time to time.
SHOP DRAWINGS: The Vendor shall promptly submit for approval to WCC all shop drawings, samples, product data, manufacturers' literature and similar submittals
ireafter referred to as "submittals") required by WCC's contract with the owner within 30 days of the receipt of this Order. The Vendor shall be responsible to WCC for the
curacy and conformity of its submittals to the Order The approval of any Vendor submittal shall not be deemed to authorize deviations, substitutions or changes in the
iuirements of the Order unless express written approval is obtained from WCC authorizing such deviation, substitution or change. WCC is entitled to rely on the accuracy and
impleteness of any professional certifications required by the Order concerning the performance criteria of systems, equipment or materials, including all calculations relating
ireto and any governing performance requirements. If Vendor is responsible for design, Vendor shall accept all responsibility for structural and functional adequacy of such
swings and acceptance by WCC  Any structural or functional failure or inadequacy which may result from such design shall be remedied by the Vendor. In addition, the
indor shall bear all resultant costs such as work by other trades or contractor(s), architectural and engineering charges, loss of rent, and any damages
SCHEDULE: WCC shall prepare the schedule for delivery of the Order and shall revise and update such schedule, as necessary, as the project progresses (Original
hedule is based schedule with a run date of October 7, 2013) The Vendor shall be bound by the schedule of deliveries provided the Vendor is
omptly and reasonably notified in advance of the schedule of delivery change WCC may at its discretion delay delivery of the whole or part of the order as it sees fit. Failure to
liver materials as required per the schedule may result in liquidated damages per the WCCowner contract
TITLE AND RISK: Regardless of the F.O.B. point, title and risk of loss shall remain with the Vendor until the Order has been delivered and accepted by WCC  Upon
tification of shortages or damages, the Vendor shall make good the shortage or damaged materials in question. Whenever it is useful or necessary for WCC to do so, WCC
all be permitted to use any of the material(s) which have been delivered to replace material shortages or defects. The Vendor shall remedy any defect in materials or

workmanship which may occur as required by WCC.

**G. COMPLIANCE WITH THE LAW:** The Vendor warrants that the Order will not violate or cause WCC or the Owner to be in violation of any applicable federal, state or local laws, regulations or orders. Notwithstanding the aforementioned with respect to the Occupational Safety and Health Act of 19070 (OSHA) and standards promulgated there under the Vendor warrants that the order will conform to the requirements of OSHA regardless of how they are used. The Vendor agrees that the Order will be produced in accordance with Sections 6, 7 and all applicable requirements of the Fair Labor Standards Act if the Order is to be used on a federal government contract, the Vendor shall comply with all provisions of the Federal Acquisition Regulations, 48 C.F.R., Chapter 1, Parts 1-99. If the Order will be used on a Department of Defense contract, the Vendor shall comply with all provisions of the Federal Acquisition Regulations, 48 C.F.R., Chapter 1, Parts 201-299. This Order shall be governed by the laws of the Commonwealth of Kentucky, and any dispute between the Vendor and WCC arising out of or relating to this Order or a breach thereof, which is not resolved by the parties, shall be submitted to a judicial court of competent jurisdiction within Jefferson County, Kentucky. The Vendor further agrees that no dispute shall interfere with the progress of the Vendor's deliveries and the Vendor agrees to proceed with its work as directed. Disputes it may have with WCC, the Owner or other parties.

**H. CHANGES:** WCC shall have the right to make changes to the Order (including additions and deletions) for changes in the specifications, drawings, design, quantity, destination, packing instructions or delivery schedule. When WCC orders in writing, the Vendor, without notifying this Order, shall make any and all changes in the Order which are within the general scope of this Order. Adjustments in the Order price or time, if any, resulting from such changes shall be set forth in a Change Order or a new Purchase Order, prepared by WCC and signed by the Vendor stating their agreement. All changes include and constitute the Vendor's full and complete compensation for all costs, direct and indirect, and time resulting from the work to be performed under the change.

**I. JOINT DRAFTING:** WCC and the Vendor expressly agree that the Purchase Order Agreement was jointly drafted, and that they both had an opportunity to obtain the assistance of counsel in reviewing its terms prior to execution. Therefore, the Purchase Order Agreement shall be construed neither against nor in favor of either party, but shall be construed in a neutral manner.

**J. INSPECTIONS:** WCC may inspect the order during its manufacture, construction or preparation at reasonable times and shall have the right to inspect the materials at the time of their delivery and/or completion. The Vendor shall schedule all tests (including those by independent Testing Labs) required by the specifications or drawings. Notwithstanding the acceptance or approval and inspections of the material(s) or portions thereof all materials with defects or nonconformities for which the Vendor is responsible are revealed by subsequent inspection, analysis or otherwise, the Vendor shall at its cost replace the defective or nonconforming materials including the necessary labor required for its replacement.

**K. DEDUCTIONS AND SET-OFF:** Any sums payable to the Vendor shall be subject to any claims and defenses of WCC, whether arising from this or any other transaction or occurrence, WCC may set-off and deduct against any such sums all present and future indebtedness of Vendor or any of its affiliated companies.

**L. WARRANTY:** The Vendor warrants its material(s) against all deficiencies and defects in materials and/or workmanship and as called for in the Order. Unless otherwise specified in WCC's contract with the Owner, the Vendor shall warrant its material(s) as described above for a period of one (1) year from the date(s) of substantial completion. Repair or replacement of materials after substantial completion/acceptance renews and restarts the warranty period for those repaired/replaced items. The Vendor further agrees to furnish any special warranties that shall be required in accordance with the Purchase Order Documents prior to final payment.

**M. SUBSTITUTIONS:** No substitutions shall be made in the Order unless permitted in the Order and only then upon the Vendor first receiving all approvals required under the contract for such substitutions.

**N. CONTINGENT ASSIGNMENT of PURCHASE ORDER** The Contractor may assign this Purchase Order to the Owner if required under the Contract. This assignment shall be effective only when the Owner: (a) has terminated the Contract for cause, and (b) has accepted the assignment by notifying the Vendor in writing. The contingent assignment is subject to the prior rights of a surety that may be obligated under the Contractor's bond, if any. Vendor hereby consents to such assignment and agrees to be bound to the Owner, as assignee, by the terms of this Purchase Order.

**O. TERMINATION:** Should the Owner terminate its Contract with the Contractor, or any part which includes this Order or any part thereof, WCC shall so notify the Vendor in writing within five (5) calendar days of the termination and, upon written notification, this Purchase Order Agreement shall be terminated and the Vendor shall immediately stop the Order, follow the Contractor's instructions regarding shutdown and termination procedures, and mitigate all costs. In the event that the Owner terminates it's Contract with the Contractor for the convenience of the Owner, then the Contractor's liability to the Vendor for any damages incurred or claims resulting from the Owner termination, shall be extinguished

**P. PROTECTION OF MATERIAL:** The Vendor specifically agrees that it is responsible for the protection of its material until acceptance by WCC, and will make good or replace, at no expense to WCC, losses and any damages to its material(s) which occurs prior to delivery.

**Q. PATENT, COPYRIGHT or TRADEMARK INFRINGEMENT:** The Vendor agrees to indemnify and hold harmless WCC and the Owner from any and all costs, expenses, liabilities and damages, including attorney's fees which WCC or the Owner may incur in connection with any suit or claim of infringement of any copyright, trademark or patent by reason of manufacture, sale or use of item(s) that are part of this Order. If so required by WCC or the Owner, the Vendor agrees to appear in and assume the defense of any litigation to which WCC or the Owner has been made a part which relates to any such infringement.

**R. MATERIAL SAFETY:** Material Safety Data Sheets (MSDS) sheets as required by law and pertaining to materials included in this Order shall be submitted to WCC with submission of shop drawings, and again when the material is delivered to the site.

**S. PERMITS, FEES AND LICENSE:** The Vendor shall secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary to deliver the Order.

**T. DEFAULT:** Either party shall be in default of this Order upon the occurrence of either of the following events: i) The other party's insolvency or actions indicating insolvency such as the filing of a petition by or against such party under any chapter of the bankruptcy code, the appointment of a receiver for such party, or such party's attempt to make a general assignment for the benefit of creditors, or ii) that party's failure to comply with any of its obligations for a period of three days after notice thereof is given to one party by the other party

**T 1 NOTICE TO CURE:** If the Vendor should fail to comply with any of it obligations, disregards laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, or otherwise is guilty of a breach of a provision of the Purchase Order Documents, the Vendor is deemed to be in default of this Purchase Order. If the Vendor fails within three (3) working days after written notification to commence and cure (or continue prompt and diligent correction of such default to the satisfaction of WCC than WCC without prejudice to any other rights or remedies, shall have the right to any or all of the following remedies.

    (a) supply or contract to supply workers and materials, equipment and other facilities as WCC deems necessary for the satisfactory and expeditious correction of such default and charge the cost thereof to the Vendor, who shall be liable for the payment of same including reasonable overhead, profit and attorneys' fees;

    (b) withhold payment of monies due the Vendor;

    (c) terminate the employment of the Vendor for all or a portion of the Purchase Order Work; and/or

    (d) in the event of an emergency affecting the safety of persons or property, WCC may proceed to commence and continue satisfactory correction of such default, without first giving three (3) working days' written notice to the Vendor, but shall give prompt written notice of such action to the Subcontractor

**U REMEDY:** Any default by the Vendor as set forth in T DEFAULT will be cause for cancellation of this Order. If so WCC so chooses if termination is ordered by WCC, then WCC will have no further obligations hereunder

**V. CANCELLATION FOR CONVENIENCE:** WCC shall have the option at any time (whether or not Vendor is in default) to cancel this Order in whole or for that portion of the Order that has not yet been delivered. Such cancellation shall be without cost to WCC provided the order is for standard stock goods which can be resold by the Vendor, including services not yet provided. In all other cases the Vendor shall have the right to compensation in case of cancellation for Vendor's actual cost incurred up to the date of cancellation, provided that such amount together with the sum of previous payments not exceed the total purchase price of the Order, provided that the Vendor deliver to WCC any partially or wholly completed items prior to being entitled to payment. All claims for compensation under this section shall be provided within five (5) days in writing from the Vendor to WCC. Failure to do so waives all rights of the Vendor to claim compensation.

**W. LIMITATION OF ASSIGNMENT:** The Vendor may not assign this order or any portion thereof without the prior written consent of WCC. WCC at its sole and absolute discretion may declare any assignment without the proper written consent to be void. No consent or acceptance of any assignment shall relieve the Vendor from fulfilling its responsibilities under this Order

**X. WCC's RIGHTS AND REMEDIES:** Any rights or remedies granted to WCC in this Order are not exclusive of, but are in addition to any other rights or remedies granted in any other part of this Order and any other rights that WCC may have I law or in equity

**Y. ENTIRE AGREEMENT:** This document, together with any other documents or information incorporated herein by reference, and constitutes the entire agreement between the Vendor and WCC. All prior or contemporaneous written or oral agreements including proposals and quotations are superseded by this agreement

Validated Custom Solutions

_____
Dan Fillenwarth
Owner
Date: _11/_1_/____

CARDINAL SQUARE, LLC
~~WHITE FEATHER CONSTRUCTION CO.~~

_____
~~Dan Noonan~~ Larry Gough
~~Vice President of~~ Preconstruction Manager
Date: November 6, 2013

2 of 2